# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**ANDREA TUMBLESON,**

**Plaintiff,**

**Case No. 1:23-cv-395**

**v.**

**JUDGE DOUGLAS R. COLE**

**LAKOTA LOCAL SCHOOL
DISTRICT, et al.,**

**Defendants.**

## OPINION AND ORDER

Plaintiff Andrea Tumbleson sought to use accrued paid sick leave to attend training necessary to obtain a service dog. Defendants Lakota Local School District and Lakota Local School District Board of Education (collectively Lakota) denied her request for paid leave, asserting she was not "sick" as the policy defines that term. But Lakota did grant her unpaid leave. Unhappy with that result, Tumbleson sued Lakota for disability discrimination. The parties now cross-move for summary judgment. For the reasons discussed more fully below, the Court **GRANTS** Lakota's Motion for Summary Judgment (Doc. 23), and therefore **DENIES** Tumbleson's Motion for Partial Summary Judgment (Doc. 24).

## BACKGROUND

Lakota has employed Tumbleson as a teacher since 1997. (Tumbleson Dep., Doc. 19-1, #129). Her contract recently renewed for the 2024–25 school year, and she currently serves as a middle school art teacher. (*Id.* at #129, 132; *see also* Ex. 1, Doc. 19-2, #251–52). Tumbleson is also a member of the Lakota Education Association

1

(LEA), a teacher's union, through which she's subject to a collective bargaining agreement. (Doc. 19-1, #131; *see also* Doc. 22-1, #501–03). As part of her teaching role, Tumbleson builds and delivers lesson plans, and provides instruction and feedback to students. (Doc. 19-1, #132). She teaches six classes per day, each of which is forty-two minutes long. (*Id.*). Every semester Tumbleson has about 160 students. (*Id.*).

Tumbleson enjoys her job, but teaching comes with its difficulties. For Tumbleson, those difficulties largely arise from her medical history. She suffers from a hearing impairment that rendered her deaf and necessitated cochlear implants, which she received in 2006 and in 2010, respectively. (*Id.* at #136, 152). Tumbleson also has Usher syndrome with retinitis pigmentosa—a genetic disease that causes progressive vision and hearing loss. (*Id.* at #136–37; *see also* Neff Dep., Doc. 20-1, #369).

Those diagnoses, according to Tumbleson, eventually began to affect her work. (Doc. 19-1, #141). In 2012 she noticed that she needed more classroom lighting to see properly. (*Id.*). So her then-principal installed non-florescent lightbulbs in her classroom ceiling and provided floor lamps for her classroom. (*Id.* at #141–42). Then, in 2021, she requested a larger computer screen (again because of vision loss), which Lakota also provided. (*Id.* at #144–45). And Tumbleson requested modifications to PowerPoint presentations that Lakota sent out (e.g., having the slides use a black background with white text). (*Id.* at #146–48). Lakota seemingly accommodated that request by installing software on Tumbleson's computer. (*See id.*).

Those obstacles aside, Tumbleson testified that she is "able to do [her] job." (*Id.* at #137). Not to mention, Lakota has renewed her teaching contract each year since 1997, routinely giving her positive teaching evaluations, and it has never disciplined her for poor job performance. (*Id.* at #137–38; Kramer Depo., Doc. 21-1, #441–42, 469). No parents have complained about any teaching deficiencies either. (Doc. 19-1, #138).

With that background established, the Court turns to the specifics of this lawsuit, which largely turns on Tumbleson's pursuit of a service dog. In 2013, after deciding that she "needed [her] life to be a little easier," Tumbleson submitted her first application for a service dog. (*Id.* at #150). But the governing organization that allocates service dogs denied her application. (*Id.* at #151). "[D]evastat[ed]" by that rejection, Tumbleson waited nearly ten years before applying again. (*Id.* at #152–53).

Then, in August 2022, Tumbleson applied for a service dog again. This time, though, she did so through a different organization—Leader Dogs for the Blind (Leader Dogs). (*Id.* at #153–54). Leader Dogs accepted Tumbleson into its program. (*Id.* at #155). Before matching her with a service dog, however, two things had to happen. First, she had to attend a week-long cane orientation and training session in September 2022 to assess whether she was ready for a service dog. (*Id.* at #156–60). Tumbleson did so. (*Id.* at #154–56; Doc. 21-1, #456). To meet that requirement, she requested to use her accrued paid sick leave to account for her one-week absence from work, which Rob Kramer, Lakota's Executive Director of Human Resources, approved. (Doc. 19-1, #160–61; Doc. 21-1, #411–12). Next, having completed the cane training, Tumbleson had to formally apply for a service dog. (Doc. 19-2, #162–63). She

3

did that, as well. (*Id.* at #163–64). At that point, in January 2023, Leader Dogs approved Tumbleson's application and matched her with a service dog. (*Id.* at #164).

But there was one final step. To receive the dog, Tumbleson had to complete formal training with the service dog Leader Dogs had selected for her. (*Id.* at #165). That training session, which occurred in Michigan, required thirteen days of leave from May 8 to May 24, 2023. (*Id.* at #165–66, 190). So Tumbleson again requested to use her accrued paid sick leave to cover her absence from work. (Doc. 19-1, #172–74; Doc. 20-1, #432–33; Doc. 22-1, #489–91). This time, however, Kramer denied Tumbleson's request, instead telling her he would grant her an unpaid leave of absence. (Doc. 19-1, #181; Doc. 21-1, #417–18; Doc. 22-1, #498–99).

In short, the parties agree about *what* happened—Tumbleson attended service dog training in May 2023 on an unpaid leave of absence. (Doc. 19-1, #190; Doc. 23, #530). But they disagree about *why* things played out that way. Lakota says it was because Tumbleson didn't qualify for paid sick leave; Tumbleson says it was because of unlawful discrimination. Take each side's version in turn.

Start with Lakota's account. According to Kramer, even though Tumbleson had accumulated enough sick leave to cover her absence, he could not approve her request because attending dog training fell outside the school board policy's and the collective bargaining agreement's definition of "sick leave."[1] (Doc. 21-1, #417, 422). The policy and agreement permit sick leave for "[a] personal illness, pregnancy, exposure to

---

[1] Both the school board policy's and the collective bargaining agreement's definition of sick leave is based on the Ohio Revised Code's definition of sick leave. (*See, e.g.*, Doc. 22-1, #507 (citing Ohio Rev. Code §§ 124.38, 3319.141)).

contagious disease which could be communicated to others, and for ... illness, injury, or death in [an] employee's immediate family." (Doc. 22-1, #501–03, 507). In Kramer's view, Tumbleson's absence wasn't for any of those things, including, most notably, a personal illness. (Doc. 21-1, #414–15, 437–38). Nor did Kramer believe Tumbleson qualified for leave under the Family Medical Leave Act (FMLA) for essentially the same reason. (*Id.* at #439). That is, Tumbleson's absence did not fall into any of the FMLA's qualifying circumstances—birth, adoption, tending to a family member, or a serious health condition that rendered her unable to perform her job functions. (*Id.* at #439–41; *see also* Doc. 22-1, #509–10).

Before making his determination, though, Kramer asked Tumbleson for details about the dog training, which she provided. (Doc. 22-1, #488–91). Kramer also "sp[oke] to other people" within the district who are "involved" in leave decisions. (Doc. 21-1, #416; *see also* Doc. 22-1, #495–96 (explaining that Kramer's response to Tumbleson "was based on legal counsel and what can be done legally with sick leave")). Based on those conversations and his own understanding of the relevant policies, Kramer concluded that attending dog training didn't qualify as a basis for using paid sick leave, but he still offered Tumbleson an unpaid leave of absence so she could go. (*See* Doc. 21-1, #416). In the email relaying that determination, Kramer offered to meet with Tumbleson, (Doc. 22-1, #493–94), but Tumbleson declined, (Doc. 19-1, #181; Doc. 21-1, #433). Instead, Tumbleson filed a charge of discrimination with the Ohio Civil Rights Commission on March 9, 2023. (Doc. 19-2, #274).

5

There is one other detail worth noting. Kramer explained that he "mistake[nly]" approved Tumbleson's sick leave request to attend cane training in September 2022 and "shouldn't have approved [that paid leave] to begin with." (Doc. 21-1, #457–58). According to him, if a teacher requests less than ten days of leave, the request is handled in a "day-to-day more natural way" only "occasionally" requiring him to get involved. (*Id.* at #412–13). Because Tumbleson's September 2022 leave request was for only one week (not thirteen days like her May 2023 leave request), Kramer simply approved the 2022 sick leave request without thoroughly exploring whether it was proper sick leave. (*See id.* at #467).

Now compare that to Tumbleson's account, which is straightforward. She believes Lakota discriminated against her by denying her request to use accrued paid sick leave to attend the dog training in May 2023. (*See generally* Compl., Doc. 1; *see also* Doc. 19-1, #230–31). In Tumbleson's view, Usher syndrome is both a "personal illness" under the school board's sick leave policy and a "serious health condition that requires continuous treatment from a health provider" under the FMLA. (*See* Doc. 24, #556, 558). So, she says, in denying her paid sick leave request, Kramer "drew an arbitrary distinction" and "applied the [sick leave] policy in an ad hoc … manner," thus exhibiting disability discrimination. (Doc. 24, #556–57).

Tumbleson's theory rests, in part, on one other important account: that of Doctor Alison Perkins Neff. Doctor Neff is Tumbleson's primary care doctor. (Doc. 19-1, #205–06; Doc. 20-1, #334). At a regularly scheduled appointment on June 1, 2023—about one week after Tumbleson returned from the dog training—Dr. Neff learned

that Lakota had denied Tumbleson sick leave. (Doc. 20-1, #354–55, 368–69). So Dr. Neff (apparently without Tumbleson's prompting) wrote a letter "to help [Lakota] understand that [the dog training] was in fact medical leave for the purpose of treating and managing [Tumbleson's] Usher syndrome." (*Id.* at #327, 368–69; *see also* Doc. 20-2, #396). In other words, Dr. Neff wrote the letter to Lakota to help Tumbleson retroactively obtain sick pay. (Doc. 20-1, #364, 368–69). But to no avail. Even after receiving the letter, Lakota did not retroactively grant sick pay. (*See* Doc. 21-1, #451–53). And to Tumbleson, that refusal further evinces disability discrimination. (*See* Doc. 24, #550; *see also* Doc. 27, #587–88).

Unhappy that Lakota denied her paid sick leave, Tumbleson filed this three-count suit alleging: (1) failure to accommodate under the ADA, (2) disability discrimination under the ADA, and (3) FMLA interference. (Doc. 1, #7–10). She brings each claim under corresponding Ohio law too. (*Id.* (citing Ohio Rev. Code § 4112.02)).

Lakota now moves for summary judgment on all three claims. (Doc. 23). Tumbleson cross-moves for summary judgment, but only on the issue of liability, not damages. (Doc. 24). Each party responded to the other's motion, (Docs. 26, 27), and then replied, (Docs. 28, 29). So the motions are ripe for review.

## LEGAL STANDARD

In evaluating the parties' cross-motions for summary judgment, the Court keeps in mind that "[t]he 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying

those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *See, e.g.*, *Rudolph v. Allstate Ins. Co.,* No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). But the non-moving party cannot defeat a motion for summary judgment merely by pointing to any factual dispute. As the Sixth Circuit has explained, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (emphasis omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In sum, the nonmoving party must present some "sufficient disagreement" that would require submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

When both parties move for summary judgment, that does not change the analysis the Court applies to each party's motion. Rather, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Black*

*v. Pension Benefit Guar. Corp.*, 973 F.3d 576, 581 (6th Cir. 2020) (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (quotation marks omitted)). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quoting cases).

## LAW AND ANALYSIS

Tumbleson asserts three claims. Two of them arise under both the ADA and Ohio's anti-discrimination statute, Ohio Rev. Code § 4112.02. (Compl., Doc. 1, #7–10). But because "Ohio's disability discrimination law parallels the [ADA] in all relevant respects," the Court applies the same analysis to the federal and state claims. *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015) (quoting *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008), and citing *City of Columbus Civ. Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206–07 (Ohio 1998)). The third claim arises under the FMLA.[2] The Court considers each claim in turn.

---

[2] Tumbleson's third claim is for "FMLA Interference." (Doc. 1, #9–10). And she asserts that claim under both the FMLA and Ohio Revised Code § 4112.02. (*Id.* at #9). But the allegations are specific to the FMLA and make no mention of Ohio law. (*See id.* at #9–10). So the Court understands Tumbleson to press this claim under the FMLA alone.

A.    **Lakota Is Entitled to Summary Judgment on the Failure-to-Accommodate Claim Because It Provided Tumbleson a Reasonable, Effective Accommodation.**

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). One way an employer violates that provision is by failing accommodate an otherwise qualified disabled employee's physical or mental limitations. *Id.* § 12112(b)(5)(A).

Tumbleson asserts just such a claim here. She says Lakota failed to accommodate her hearing and vision impairments when it rejected her request to use accrued paid sick leave to attend dog training. (Doc. 1, #7–8; Doc. 24, #549–553). Lakota rejects that conclusion, arguing that it did accommodate Tumbleson's request. (Doc. 23, #533–36). In the end, Lakota has the better argument.

Basically, failure-to-accommodate claims work as follows. When an employee has a disability that makes a reasonable accommodation necessary to allow the employee to perform an essential function of his or her job, the employer has an obligation to provide that accommodation, *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 459 (6th Cir. 2002), so long as doing so would not create an undue hardship, *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1230 (6th Cir. 2022). But some important limitations circumscribe that principle. First, the employee has an obligation to raise the need for an accommodation before the employer is tasked with working to provide one. *Id.* at 1232 (explaining that an "once an employee requests an accommodation" that triggers the employer's "duty" (cleaned up)). Second, the employer need not

provide the precise accommodation that an employee "requests or prefers." *Trepka*, 28 F. App'x at 459. Rather, the employer and employee are to engage in an "interactive process" to identify a reasonable accommodation that serves the intended purpose of overcoming the limitations resulting from the employee's disability. *Blanchet*, 27 F.4th at 1232. Moreover, even if the employee's requested accommodation is reasonable, the employer "retains the 'ultimate discretion' to choose another [reasonable and] effective accommodation[] [that is] less expensive or easier to provide." *Trepka*, 28 F. App'x at 459–60 (citing *Hankins v. The Gap*, 84 F.3d 797, 800–01 (6th Cir.1996)). In other words, an employer's obligation is to provide *a* reasonable accommodation, not necessarily *the* reasonable accommodation that the employee requests. *Id.*

So how does that all play out here? To start, the parties appear to agree that Tumbleson is disabled under the ADA. True, Lakota quibbles that Tumbleson has "overstate[d] her disability," but it nonetheless seems to concede that Tumbleson's hearing and vision impairments amount to disabilities as the ADA defines the term.[3] (Doc. 26, #572–73; *see also* Doc. 21-1, #410, 466–67). And the parties also agree—for the most part—that Tumbleson requested an accommodation. (Doc. 23, #533–34; Doc. 24, #550–51). Again, Lakota hedges that concession, arguing that a request for sick

---

[3] If Lakota is contesting whether Tumbleson is disabled under the ADA, that argument is not well taken. Tumbleson wears cochlear implants because she is "totally deaf," (Doc. 19-1, #136, 152), and Usher syndrome has rendered her legally blind, (Doc. 20-1, #363). Those two things strike the Court as "physical ... impairment[s] that substantially limit[] one or more major life activities." *See* 42 U.S.C. § 12102(1). In any event, because the Court grants summary judgment in Lakota's favor for other reasons on both ADA claims, the Court need not tarry with this aspect of Tumbleson's prima facie case.

leave isn't really the same as requesting an ADA accommodation; rather, it was Tumbleson's entreaty to use her service dog at school that amounted to an ADA accommodation request.[4] (Doc. 23, #533–34). But that cavil ultimately doesn't matter because, whether properly framed as an ADA accommodation request or not, Lakota accommodated Tumbleson's request for leave to attend service dog training.

To see how Lakota met its accommodation obligations, recall that an employer "retains the ultimate discretion" to choose between reasonable, effective accommodations. *Trepka*, 28 F. App'x at 459–60 (quotation omitted). That discretion proves fatal to Tumbleson's claim here. Take the timeline step-by-step. Tumbleson first requested "leave" (without specifying which type) on January 12, 2023, in an email to Kramer. (Doc. 22-1, #487). Kramer replied. In that reply, he asked for Tumbleson's "official 'leave' request" and stated that he saw the dog training opportunity "as an accommodation that [they] would work through together," but that he "need[ed] more details before [] mov[ing] forward." (*Id.* at #488). At that point, Tumbleson requested leave that would allow her to use her sick days or perhaps FMLA leave because the leave was "medically related." (*Id.* at #490). In the same email, she provided a thorough explanation of the Leader Dogs program and why securing a service dog was important to her. (*Id.* at #489–91). But she did not submit any medical documentation for Kramer's review at that time. (*See* Doc. 19-1, #194–95; Doc. 21-1, #420). Kramer then responded, explaining that, based on Tumbleson's description of the dog training, her leave request did not "fall into the permissible

---

[4] Tumbleson does not argue that Lakota failed to accommodate her use of the service dog.

reasons for utilization of either paid sick leave or unpaid FMLA leave." (Doc. 22-1, #494). He added that he would "be happy to meet" with Tumbleson to discuss whether Lakota could accommodate her leave request under the ADA as unpaid leave. (*Id.*). But Tumbleson never took Kramer up on that offer to meet. (Doc. 19-1, #181; Doc. 21-1, #433).

In short, Lakota did all that the ADA requires of it. After reviewing the information Tumbleson provided in connection with her request for paid sick leave, Kramer determined that Lakota's policies precluded Tumbleson's preferred accommodation. So he offered an alternative accommodation that would still allow Tumbleson to attend the dog training: unpaid leave. The record further reveals that Kramer spoke to other individuals who are "involved … in these [leave] decisions," such as Lakota's legal counsel, before making his determination. (Doc. 21-1, #416; Doc. 22-1, #495–96). Nothing bound Kramer to Tumbleson's sick leave request or mandated that he accept it. Rather, Kramer had the ability to suggest an alternative reasonable and effective accommodation, which he did. In the Sixth Circuit, "unpaid leave can constitute [a] reasonable accommodation." *Woodling v. GeoBuild, LLC*, 600 F. Supp. 3d 815, 826 (N.D. Ohio 2022), *aff'd*, No. 22-3499, 2023 WL 335283 (6th Cir. Jan. 20, 2023); *see also Squiers v. Washtenaw Cnty.*, No. 21-11956, 2023 WL 3506422, at *3 (E.D. Mich. May 17, 2023), *reconsideration denied*, No. 21-11956, 2023 WL 4565463 (E.D. Mich. July 17, 2023). And here, where Kramer understood the school board policy and collective bargaining agreement to foreclose paid sick leave, unpaid

leave was a reasonable alternative. It was also effective, permitting Tumbleson to attend the dog training—the reason for requesting leave in the first place.

True, Kramer could have perhaps probed further about Tumbleson's precise need for the service dog, (*see* Doc. 21-1, #442), or met with her in-person to discuss why she needed paid, as opposed to unpaid, sick leave, (*see* Doc. 19-1, #181; Doc. 21-1, #433). But his failure to do those things doesn't render Lakota's counter accommodation—unpaid leave—inadequate. Kramer asked for specifics regarding Tumbleson's leave request, (Doc. 22-1, #488); Tumbleson thoroughly provided them, (*id.* at #489–91); Kramer consulted others to determine whether paid sick leave was viable based on those specifics, and when he determined it wasn't, he offered an alternative option, (*id.* at #493–96). Given that the interactive process requirement is meant to "identify[] a reasonable accommodation rather than [act as] an end in itself," *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 331–32 (6th Cir. 2023) (cleaned up), the Court cannot conclude that Kramer's investigation faltered. Indeed, when an employer "tak[es] the extra step of proposing counter accommodations," that reflects good faith. *Id.* at 332 (cleaned up). So whether Kramer's interactions with Tumbleson amount to "a model interactive process," matters not. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). At day's end, all agree that Lakota allowed Tumbleson to attend the dog training after she notified Kramer of the opportunity. (Doc. 19-1, #190; Doc. 21-1, #418). Lakota, therefore, accommodated her.

Tumbleson offers several counterarguments, but they all fail to persuade. Start with the reasonableness of her requested accommodation. Tumbleson argues that her

14

hearing and vision impairments unequivocally qualify as a "personal illness" under the school board policy and collective bargaining agreement. (Doc. 24, #551). And in her view, that means using her accrued paid leave was a reasonable accommodation under the ADA. (*Id.*). Admittedly, Lakota has produced no codified definition of "personal illness." (*See* Doc. 21-1, #438). But that ultimately does not matter. The ADA, which is the relevant law here, has nothing to say about whether an employee is entitled to her sick leave; that's the domain of contract or property law. *See Hannan v. Chesapeake Union Exempted Vill. Sch. Dist. Bd. of Educ.*, 535 N.E.2d 392, 395 (Ohio Ct. App. 1988). True, if Lakota violated the policy, Tumbleson may have a state-law claim under it. But that possibility does not transform the hypothetical state-law claim into an ADA failure-to-accommodate claim, as well. Rather, the ADA asks only whether an employer failed to provide an employee a reasonable and effective accommodation for her disability. As the Court has explained, Lakota did. It granted Tumbleson an unpaid leave of absence to attend the dog training. That's a reasonable accommodation on the facts here.

Next consider Tumbleson's gripe about the effectiveness of Lakota's accommodation. She argues that in vetoing her use of accrued paid sick leave, Lakota denied her "the most effective accommodation." (Doc. 24, #551). Tumbleson's trouble, though, is that the ADA does not require Lakota to provide *the most* effective accommodation. *See Trepka*, 28 F. App'x at 459. As discussed above, Lakota only had to prove *an* effective accommodation, which it did. So this argument is a nonstarter.

Because all agree that Lakota allowed Tumbleson to attend the dog training on an unpaid leave of absence, no reasonable jury could conclude that Lakota failed to accommodate Tumbleson's claim. Accordingly, the Court **GRANTS** Lakota's motion on this claim, and thus **DENIES** Tumbleson's motion on this claim.

**B.  Lakota Is Entitled to Summary Judgment on the Disparate Treatment Claim Because Tumbleson Failed to Establish a Prima Facie Case.**

Another way to allege disability discrimination is through a disparate treatment claim. *See, e.g., O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 619 (6th Cir. 2020). Tumbleson raises that sort of claim here too. The Court analyzes her disparate treatment claim, which she advances via circumstantial evidence, under the indirect evidence test—that is, under the *McDonnell Douglas* burden-shifting framework.[5] *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023).

The *McDonnell Douglas* framework involves three steps. First, Tumbleson must make out a prima facie case of disability discrimination. That requires her to show by a preponderance of the evidence that (1) she has a disability, (2) she is

---

[5] This Court has twice noted the tension between the "genuine dispute of material fact" standard that applies at summary judgment and the "preponderance of the evidence" standard that courts often use in executing the *McDonnell Douglas* framework. *Abernathy v. TriHealth G LLC*, No. 1:22-cv-624, 2025 WL 689333, at *10–11 (S.D. Ohio Mar. 4, 2025); *Burress v. Spring Grove Cemetery & Arboretum*, No. 1:18-cv-879, 2020 WL 3036047, at *8–9 (S.D. Ohio June 5, 2020). The Sixth Circuit seems to address that incongruity by "understanding 'preponderance of the evidence' merely to mean that the plaintiff has created at least a genuine dispute of material fact as to each element of the required showing at a given stage[.]" *Abernathy*, 2025 WL 689333, at *11 (citing cases). So the Court will apply that understanding here, even though it is in many ways "difficult to square with Federal Rule of Civil Procedure 56." *Hittle v. City of Stockton*, __ U.S. __, 145 S. Ct. 759, 759–60 (2025) (Thomas, J., dissenting).

otherwise qualified for the position, with or without a reasonable accommodation, (3) she suffered an adverse employment decision, (4) Lakota knew or had reason to know of her disability, and (5) Lakota treated similarly situated employees more favorably. *O'Donnell*, 833 F. App'x at 619. Second, if Tumbleson makes the requisite showing, the burden shifts to Lakota to provide "a legitimate, nondiscriminatory reason for the adverse employment action." *Hrdlicka*, 63 F.4th at 567 (quotation omitted). Finally, if Lakota offers a legitimate, non-discriminatory reason for its action, then the burden shifts back to Tumbleson to show, once again by a preponderance of the evidence, that Lakota's provided reason amounts to "pretext designed to mask discrimination." *Id.* (quotation omitted).

The parties' dispute on this claim begins and ends at the prima facie step of the framework, particularly elements three and five. Lakota argues that Tumbleson has not established any adverse employment action, nor produced any evidence that Lakota treated similarly situated non-disabled teachers differently when granting sick leave requests. (Doc. 23, #536–37). Tumbleson maintains that being placed on unpaid leave constitutes adverse employment action and that she has satisfied the similarly situated element. (Doc. 24, #554–57). Both elements warrant consideration, but ultimately, Tumbleson fails on each.

Start with the third element. The Sixth Circuit has yet to decide whether unpaid leave is an adverse employment action. *See, e.g.*, *Squiers*, 2023 WL 3506422, at *4; *Williams v. Mid-Am. Conversion Servs., LLC*, No. 2:22-cv-2052, 2023 WL

17

8565948, at *9 (S.D. Ohio Dec. 11, 2023). Regardless, the unpaid leave at issue here, and the way it came about, does not rise to the requisite level.

"An adverse employment action is a materially adverse change in the terms or conditions of ... employment because of the employer's conduct." *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008) (cleaned up). Here, Lakota's act of providing unpaid leave satisfies neither aspect of that rule. First, the unpaid leave did not cause a material change in Tumbleson's employment; she "simply [was] not … paid for the time [s]he did not work." *Bilyeu v. UT-Battelle, LLC*, No. 3:21-cv-352, 2024 WL 1905045, at *3 (E.D. Tenn. Mar. 22, 2024). In other words, denying Tumbleson the use of her accrued paid sick leave was not a "decision causing a significant change in benefits." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (cleaned up). Lakota didn't strip her of her accrued sick days or change her benefits in any other way. It merely determined that the reason for which she requested paid sick leave did not qualify as sick leave. That's not a materially adverse determination.

Second, and perhaps more importantly, the unpaid leave did not result from Lakota's (the employer's) conduct. Tumbleson *chose* to attend the dog training; Lakota did not *place* her on unpaid leave. And Tumbleson has pointed to no caselaw suggesting that an employee who elects to take a "leave of absence and then returns to her position has suffered an adverse employment action." *Obermeyer v. McDonough*, No. 1:23-cv-711, 2024 WL 3890686, at *7 (S.D. Ohio Aug. 21, 2024). Of course, Tumbleson did testify that she could not attend the dog training outside the

May 2023 session and that she risked losing her shot at a service dog if she did not attend. (Doc. 19-1, #165–66). It's also true that she did not ask for the leave to be unpaid. Nonetheless, it was Tumbleson who voluntarily chose to attend the training. This is not a case where Lakota forced Tumbleson to take unpaid leave while it awaited changes or clarifications concerning her work restrictions, as is often the situation in unpaid leave suits. *See, e.g.*, *Williams*, 2023 WL 8565948, at *4, 9. Nor is this a case where Lakota manufactured a Hobson's choice by requiring action on Tumbleson's part to obtain the leave. *See Baker v. Windsor Republic Doors*, 414 F. App'x 764, 773 (6th Cir. 2011) (explaining that prohibiting an employee with a heart condition from returning to his job unless he waived workers' compensation benefits was an adverse employment action). The Hobson's choice here (if any) resulted from the inflexible nature of the Leader Dog's schedule, not anything Lakota required of Tumbleson. In short, given the circumstances, the Court is hard pressed to see how Lakota's decision to grant Tumbleson unpaid leave so she could attend the dog training session amounts to adverse employment action.

Now consider element five. To satisfy this element, Tumbleson must show that Lakota treated similarly situated non-disabled employees more favorably than her. *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007). And in doing so, she "must do more than make 'generalized and vague allegations' that another employee was treated better." *Stewart v. Esper*, 815 F. App'x 8, 17 (6th Cir. 2020) (quotation omitted). But such generalized and vague allegations are all that she offers here. She argues, for example, that all Lakota teachers earn their sick leave based on the same criteria

and that Kramer arbitrarily decided Tumbleson's medical condition did not qualify for sick leave. (Doc. 24, #556). But she put forth no evidence to support that contention. For instance, at her deposition, when asked to provide the name of another teacher who she believed Lakota treated differently in granting sick leave requests, she offered no name. (Doc. 19-1, #230–31). Instead, she stated that she "assum[ed] [] anybody that asked for sick leave was given it." (*Id.* at #231). A hypothetical comparator, however, isn't enough. *See Booker v. Bd. of Educ. of Toledo Sch. Dist.*, No. 24-3167, 2024 WL 5440984, at *2 (6th Cir. Dec. 12, 2024) (explaining that the plaintiff failed to establish a prima facie case of disability discrimination because "she did not identify any non-disabled … [employee] who received sick leave pay"). In other words, while Tumbleson may be correct that she need not establish "an exact correlation" with a non-protected employee, (Doc. 24, #555), she incorrectly argues that "it is unnecessary to pick out a specific comparator," (Doc. 27, #585). Without a comparator, the Court cannot determine whether Lakota treated her differently, which is what lies at the heart of a disparate treatment claim.

Separately, Tumbleson counters that *she* serves as an adequate comparator. More specifically, Tumbleson points to the discrepancy between Kramer granting her paid sick leave request to attend cane training in September 2022, but then denying her paid sick leave request to attend dog training in May 2023. (Doc. 27, #586). And she argues that those inconsistent decisions reveal disability discrimination. (*Id.*).

That's a clever argument, but it ultimately doesn't carry the day. To begin, Tumbleson offers no caselaw suggesting that she can serve as her own comparator.

Beyond that, Kramer's deposition testimony explained that the discrepancy arose because of a material difference between the two requests: the former was for fewer than ten days, and the latter was for more. When a request is for fewer than ten days, it's typically handled "day-to-day" without Kramer's involvement. (Doc. 21-1, #412–13; *see also* Doc. 22-1, #485). But when it's for over ten days, Kramer more often becomes involved in approving or denying requests. (Doc. 21-1, #412–13). Here, everyone agrees that Kramer approved a request of one leave length and denied a request for a different leave length. (Doc. 23, #530–31; Doc. 24, #546–47). And everyone agrees that the same disability—hearing and vision impairments—inspired each leave request. (Doc. 23, #527–28; Doc. 24, #545–47). So it doesn't follow, then, that Kramer ever treated a non-disabled employee more favorably. At best, it shows that Kramer should perhaps pay closer attention to sick leave requests in general to avoid "mistake[nly]" approving inappropriate requests. (Doc. 21-1, #458 ("I shouldn't have approved this to begin with. It was my mistake.")). Said differently, Tumbleson's attempted comparison doesn't work because it does nothing to show that Lakota treated a non-disabled employee more favorably.[6]

---

[6] Tumbleson also argues that because the school board policy permits sick leave for "unique or extenuating circumstances" (in addition to the other qualifying terms), Kramer's refusal to consider her extenuating circumstances when he denied her sick leave was both arbitrary and discriminatory. (Doc. 24, #555; *see also* Doc. 22-1, #507). The Court sees two problems with that argument. First, even if true, it in no way remedies Tumbleson's failure to name a similarly situated non-disabled employee who Lakota treated more favorably. Second, Lakota did not add the "extenuating circumstances" language to its policy until September 5, 2023, (Doc. 22-1, #507; *see also* Doc. 21-1, #462)—over two months after Tumbleson filed this lawsuit, (*see* Doc. 1). Given the language didn't apply then (when Kramer made his determination), the Court need not consider it now.

Given Tumbleson's failure to establish a prima facie case of disparate treatment, the Court **GRANTS** Lakota's motion on this claim, and thus **DENIES** Tumbleson's motion on this claim.

## C. Lakota Is Entitled to Summary Judgment on the FMLA Interference Claim Because Tumbleson's Disability Is Not a "Personal Illness."

That leaves Tumbleson's FMLA interference claim. Before diving into the parties' competing arguments, a little background is in order. The FMLA grants eligible employees up to twelve weeks of unpaid leave each year for various qualifying circumstances. 29 U.S.C. § 2612(a); *see also* 29 C.F.R. § 825.207 ("Generally, FMLA leave is unpaid leave."). Why, then, does Tumbleson care about FMLA leave if Lakota already granted her unpaid leave? Well because sometimes, an employee "may elect … to substitute" accrued *paid* leave for the otherwise-available FMLA leave. 29 U.S.C. § 2612(d). When an employee can do so, the paid leave the employer provides "run[s] concurrently with the unpaid FMLA leave," allowing the employee to receive pay under the relevant paid leave policy. 29 C.F.R. § 825.207. Importantly, though, "the terms and conditions of the employer's normal leave policy" still control as to when an employee can choose to substitute accrued paid leave. *Id.* So really, there are two issues a play. The broader issue is whether an employee qualifies for FMLA leave at all—that's a question the FMLA answers. Then there's the narrower issue of whether the employer's normal leave policy allows the FMLA-qualifying employee to substitute accrued paid leave for that FMLA leave—that's a question the employer's leave policy answers.

With that background in mind, turn to the dispute at hand. "The FMLA makes it 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided [by the Act.]'" *Mullendore v. City of Belding*, 872 F.3d 322, 327 (6th Cir. 2017) (quoting 29 U.S.C. § 2615(a)(1)). Like Tumbleson's disparate treatment claim, the Court analyzes the FMLA interference claim under the *McDonnell Douglas* three-part burden-shifting framework. *Id.* First, Tumbleson must establish a prima facie case by showing "that (1) she was an eligible employee as defined under the FMLA; (2) her employer was a covered employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take FMLA leave; and (5) her employer denied FMLA benefits to which she was entitled." *Id.* (quotation omitted). If she does so, then Lakota "may offer 'a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct.'" *Id.* (quotation omitted). And if Lakota meets its burden, then Tumbleson must show that the provided reason was pretext. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014).

As with before, the parties dispute only step one—Tumbleson's prima facie case—so the Court need not address the latter two steps. Specifically, the parties disagree about whether Tumbleson qualified for FMLA leave. (Doc. 23, #537–39; Doc. 24, #557–59). But baked into that broader issue of whether Tumbleson qualifies for FMLA leave is the narrower issue of whether Lakota's policy or the collective bargaining agreement enable Tumbleson to substitute accrued paid leave for unpaid leave. If the policy or agreement do not permit her to substitute accrued paid leave

for FMLA leave, then it matters not whether she qualifies for FMLA leave (because all she would receive under the FMLA is unpaid leave, which Lakota already granted her). But if the policy or agreement do allow her to substitute accrued paid leave, then it does matter whether she qualifies for FMLA leave. In short, answering the narrower question may absolve the Court of the need to answer the broader one.

The Court concludes that is just the case here—because Tumbleson's reason for leave (attending dog training) does not fall within the terms and conditions of Lakota's paid sick leave policy or the collective bargaining agreement, she cannot substitute accrued paid leave even if she does qualify for FMLA leave. To see why, return to the school board policy and collective bargaining agreement.

Both allow employees to take paid sick leave for, among other things, "[a] personal illness." (Doc. 22-1, #501–03, 507). In defining that term, each party takes a different tack to conclude that Usher syndrome does or does not count as a "personal illness." Tumbleson says it does, claiming that an "illness" is a "disordered[,] weakened[,] or unsound condition." (Doc. 27, #580 (quoting Merriam-Webster.com)). In other words, she says Usher syndrome is a personal illness that renders her sick all the time. (Doc. 19-1, #174–77; *see also* Doc. 27, #580). Kramer says Usher syndrome doesn't count, defining a personal illness as something that leaves a teacher incapable of teaching on a specific day, such as throwing up or having strep throat. (Doc. 21-1, #414, 437–38).

To interpret the term "personal illness," the Court must first determine whether the policy and agreement are ambiguous or unambiguous. *Tera, L.L.C. v.*

*Rice Drilling D, L.L.C.*, 248 N.E.3d 196, 200–01 (Ohio 2024), *reconsideration denied*, 238 N.E.3d 127 (Ohio 2024).[7] If they're unambiguous, then the Court interprets the documents as a matter of law. *Id.* But if the documents are ambiguous, that raises a question of fact, meaning the fact-finder is generally left to resolve the ambiguity. *Id.* And importantly, a document is "unambiguous if it can be given a definite legal meaning." *Id.* (quotation omitted).

Applying those principles here, the Court finds the policy and agreement unambiguous, at least for present purposes, and thus a legal question for the Court to handle. Why? Because Tumbleson's reason for leave—attending service dog training—plainly does not fall within a reasonable meaning of "personal illness." The parties agree, and so does the Court that "personal illness" connotes a sort of health condition. (*Compare* Doc. 23, #534 n.6, *with* Doc. 27, #580). And while a disability like Usher syndrome *could* qualify as a "personal illness" in the sense that it is a health condition, Usher syndrome is not the direct reason Tumbleson took time off work. Indeed, Tumbleson admitted that at the time she requested leave, she could adequately perform her job. (Doc. 19-1, #175, 179). Tumbleson, instead, took the leave of absence to attend service dog training. True, Usher syndrome may have necessitated the service dog, and thus her attendance at the service dog training. But that indirect connection is not enough to make service dog training itself a "personal illness" that permits use of accrued sick leave. So while the parties may quibble about the precise meaning of that term, it is unambiguous in the sense that the term does

---

[7] Because the school board policy and collective bargaining agreement are based on the Ohio Revised Code, the Court assumes that Ohio's principles for contract interpretation govern.

not extend to leave that only indirectly relates to a health condition. The Court therefore need not decide between the parties' competing definitions because attending dog training falls outside any range of a reasonable interpretation.

And that conclusion makes sense. If, as Tumbleson contends, an employee with a chronic disability can invoke paid sick leave for any activity even indirectly related to that disability, despite being otherwise capable of attending work and performing her duties on the given day that leave is sought, that undercuts any meaningful distinction an employer's policy draws between different benefits—i.e., personal days, sick days, and unpaid leave. In short, even if Tumbleson's Usher syndrome may, at times, count as a "personal illness" (a question the Court need not answer), attending service dog training does not.

Ultimately, then, because Tumbleson did not qualify for accrued paid sick leave, she could not substitute it for FMLA leave, even if she qualified under the FMLA. And because Tumbleson could not substitute her leave, Lakota did not engage in FMLA interference. The Court therefore **GRANTS** Lakota's motion on this claim, and thus **DENIES** Tumbleson's motion on this claim.[8]

## CONCLUSION

For the reasons discussed, the Court **GRANTS** Lakota's Motion for Summary Judgment (Doc. 23), and therefore **DENIES** Tumbleson's Motion for Partial

---

[8] Because the Court grants Lakota's motion on each of the three claims, it need not reach Lakota's additional arguments concerning Lakota Local School District's status as a non-sui-juris entity and Tumbleson's ability to recover damages. (*See* Doc. 23, #539–41).

Summary Judgment (Doc. 24). Accordingly, the Court **INSTRUCTS** the Clerk to enter judgment and **TERMINATE** the case on its docket.

     **SO ORDERED.**

June 30, 2025
_____
**DATE**

                       _____
                       **DOUGLAS R. COLE**
                       **UNITED STATES DISTRICT JUDGE**